# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FRANK FRAGALE** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | **NO. 20-1667** |
| **v.** | : | |
| | : | |
| **WELLS FARGO BANK, N.A.** | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                    AUGUST 19, 2020

# MEMORANDUM OPINION

## INTRODUCTION

In this civil action, Plaintiff Frank Fragale ("Plaintiff") alleges that Defendant Wells Fargo Bank, N.A. ("Wells Fargo") was negligent and, therefore, liable for its intermediary role in a fraudulent wire transfer transaction perpetrated by a third party against Plaintiff. Defendant disagrees and filed a motion to dismiss Plaintiff's complaint filed pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), [ECF 4]. Plaintiff filed a response in opposition thereto, [ECF 5], and Wells Fargo filed a reply. [ECF 8]. The issues presented in the motion have been fully briefed and the motion is ripe for disposition. For the reasons stated herein, Wells Fargo's motion to dismiss is granted.

## BACKGROUND

In deciding a motion to dismiss, courts must accept all relevant and pertinent factual allegations in the complaint as true. *Phillips v. Cnty. Of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). Here, the relevant factual allegations are summarized as follows:

> While in the process of preparing to purchase a retirement home in Celebration, Florida, Plaintiff communicated with his title company, Equitable Title of Celebration, LLC ("Equitable Title"), regarding the closing process. (Compl. at ¶¶ 4-5). On May 16, 2019, Plaintiff received an e-mail from an entity

falsely claiming to be Equitable Title that provided instructions for Plaintiff to wire transfer settlement funds in the amount of $166,054.96 in order to close on the Celebration property. (*Id.* at ¶ 6). The next day, Plaintiff initiated a wire transfer for the full amount from his personal bank account to the Wells Fargo bank account specified in the e-mail, which was maintained under the name of Kelleen Chea (the "Account"). (*Id.* at ¶¶ 7, 29). After Plaintiff completed the wire transfer and Wells Fargo credited the funds to the Account, the funds were withdrawn from the Account almost immediately through two cashier's checks collectively totaling $160,000. (*Id.* at ¶ 8). Plaintiff was later informed that the Account was fraudulent, and Wells Fargo was unable to recover the funds. (*Id.* at ¶¶ 8-9).

Plaintiff alleges that Wells Fargo was aware of the large number of similar fraudulent acts occurring throughout the country in which criminals send false wiring instructions to victims and immediately withdraw the funds once the victims complete the transfer. (*Id.* at ¶ 11). Wells Fargo was also aware that such activity is often perpetrated by criminals who fraudulently open bank accounts in false names. (*Id.* at ¶ 12). Wells Fargo became aware of this kind of fraudulent scheme through many different sources over the past five years. (*Id.* at ¶ 13). For example, approximately one year prior to the underlying funds transfer, the Federal Bureau of Investigation issued a Public Service Announcement regarding this very type of fraud. (*Id.* at ¶ 15). Similarly, the American Bankers Association issued numerous publications over the last five years identifying the importance of banks in combatting wire transfer fraud schemes. (*Id.* at ¶ 18).

Plaintiff asserts a negligence claim premised on his contention that his financial loss was the result of Wells Fargo's (1) failure to properly verify the identity of the individual opening the Account under a purportedly false name (Kelleen Chea), and (2) failure to undertake reasonable, preventative steps before permitting the withdrawal of a large amount of funds when such funds had just been wired into the Account, which itself was recently opened. (*Id.* at ¶¶ 10, 29).

## LEGAL STANDARD

Rule 12(b)(6) provides that a defendant may seek to have a plaintiff's complaint dismissed because it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering whether to grant a Rule 12(b)(6) motion, a court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009)). The court must determine whether the plaintiff has alleged facts sufficient to "nudge[] [his or her] claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 570 (2007).  The complaint may not merely allege a plaintiff's entitlement to relief—it must

"'show' such an entitlement with its facts." *Fowler*, 578 F.3d at 211.  Mere "labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,*

550 U.S. at 555.  A claim will not survive a motion to dismiss if the court has construed the

complaint's factual allegations in light most favorable to the plaintiff and finds the plaintiff could

not be entitled to relief.  *Fowler*, 578 F.3d at 210.

**DISCUSSION**

As noted, Plaintiff asserts that Wells Fargo was negligent when it failed to exercise

reasonable care and allowed (1) a fraudulent account to be opened at one of its banks and (2) the

withdrawal of a large sum of money to be immediately after it was transferred to a newly-opened,

fraudulent account.[1]  In its motion to dismiss, Wells Fargo argues that (1) the negligence claim is

preempted by Pennsylvania Uniform Commercial Code ("PUCC") Article 4A ("Article 4A"), and

(2) Plaintiff has failed to plausibly allege facts sufficient to show that Wells Fargo owed a duty of

care to Plaintiff, a non-customer.  Because a negligence claim cannot proceed if it is preempted by

Article 4A, this Court will address that issue first.

### I. Article 4A Preemption

Wells Fargo argues that Plaintiff's negligence claim is preempted by Article 4A of the

Pennsylvania Uniform Commercial Code. ("Article 4A"), 13 Pa. Cons. Stat. §§ 4A101-4A507.

"Article 4A, which applies generally to wire transfers, . . . is a comprehensive scheme enacted to

govern electronic wire transfers."  *U.S. Att'y Gen. v. PNC Bank*, 2009 U.S. Dist. LEXIS 153155,

at *8 (E.D. Pa. March 31, 2009); *see also* 13 Pa. Cons. Stat. § 4A102 ("Except as otherwise

---

[1]      As clarified by Plaintiff, his claims are not based on actions that Wells Fargo undertook *during* the course of a funds transfer, but, rather, on actions and/or omissions that occurred before and after the actual money transfer.  (Pltf. Br. at 3).

provided in section 4A108 (relating to relationship to Electronic Fund Transfer Act), this division applies to funds transfers defined in section 4A104 (relating to funds transfer; definitions).”). “[P]arties whose conflict arises out of a ***funds transfer*** should look first and foremost to Article 4-A for guidance in bringing and resolving their claims.” *PNC Bank*, 2009 U.S. Dist. LEXIS 153155, at \*8 (quoting *Sheerbonnet, Ltd. v. Am. Express Bank, Ltd.*, 951 F. Supp. 403, 407 (S.D.N.Y. 1995) (emphasis added)). Article 4A provides “the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.” 13 Pa. Cons. Stat. § 4A102, cmt. As such, Article 4A “displace[s] the common law where ‘reliance on the common law would thwart the purposes of the code.’” *Bucci v. Wachovia Bank, N.A.*, 591 F. Supp. 2d 733, 779 (E.D. Pa. 2008) (quoting *New Jersey Bank N.A. v. Bradford Sec. Operations, Inc.*, 690 F.2d 339, 346 (3d Cir. 1982)).

“The scope of 4A is determined by the definition of ‘payment order’ and ‘funds transfer’ found in Section 4A-103 and Section 4A-104.” 13 Pa. Cons. Stat. § 4A102, cmt. The term “funds transfer” is defined as:

> the series of transactions, ***beginning with the originator’s payment order***, made for the purpose of making payment to the beneficiary of the order. The term includes any payment order issued by the originator’s bank or an intermediary bank intended to carry out the originator’s payment order. ***A funds transfer is completed by acceptance by the beneficiary’s bank of a payment order for the benefit of the beneficiary of the originator’s payment order***.

*Id.* § 4A104(a) (emphasis added). The term “payment order” is defined as:

> An instruction of a sender to a receiving bank, transmitted orally, electronically or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary if:

> (i)    the instruction does not state a condition to payment to the beneficiary other than time of payment;
>
> (ii) the receiving bank is to be reimbursed by debiting an account of, or otherwise receiving payment from, the sender; and
>
> (iii) the instruction is transmitted by the sender directly to the receiving bank or to an agent, funds-transfer system or communication system for transmittal to the receiving bank.

*Id.* § 4A103.

This Court finds that these definitions provide the precise range of transactions and/or occurrences governed by Article 4A.  By definition, Article 4A governs only those actions occurring between the originator's wire fund instruction ("beginning with the originator's payment order") and the beneficiary bank's acceptance of the wire transferred funds ("completed by acceptance by the beneficiary's bank of a payment order").

Here, as clarified by Plaintiff in his response to the motion to dismiss, Plaintiff's claims are premised only on the opening of the Account at Wells Fargo and the subsequent withdrawal of the funds from that Account.  Plaintiff has expressly disclaimed any cause of action premised on the wire transfer itself.  (Pltf. Br. at 3).  From a chronological factual perspective, it is apparent that the opening of the Account occurred at a point in time ***prior*** to Plaintiff's wire fund transfer instruction (the payment order).  Thus, any claim premised on the opening of the Account falls outside the scope of Article 4A.  *See Remtek Servs. v. Wells Fargo Bank, N.A.*, 2020 WL 241332, at *10 (D.N.J. Jan. 16, 2020) (quoting *ADS Assocs. Grp. v. Oritani Sav. Bank*, 99 A.3d 345, 370 (N.J. 2014) ("claims alleging negligence in the opening of an account that are not inconsistent with Article 4A may go forward.").  It is equally apparent that the challenged withdrawal of the funds occurred at a point in time ***after*** the beneficiary bank ( Wells Fargo) "accepted" the wire transferred funds.  As such, any claim premised on the withdrawal of funds from the Account also falls outside

of the scope of Article 4A.  Accordingly, Plaintiff's claims are not preempted.[2]  This Court will now address whether Plaintiff has pled sufficient facts to support a plausible claim of negligence against Wells Fargo.

## *II. Negligence: Duty*

Alternatively, Wells Fargo argues that Plaintiff fails to state a claim for negligence because the complaint does not allege facts sufficient to show an essential element of the claim; *i.e.*, duty of care.  Under Pennsylvania common law,[3] "[i]t is axiomatic that in order to maintain a negligence action, the plaintiff must show that the defendant had a duty to conform to a certain standard of conduct; that the defendant breached that duty; that such breach caused the injury in question; and actual loss or damage."  *Wisniski v. Brown & Brown Ins. Co.*, 906 A.2d 571, 575-76 (Pa. Super. Ct. 2006) (quoting *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1008 (Pa. 2003)).  The question of whether a duty exists is a question of law for the court to decide.  *R.W. v. Manzek*, 888 A.2d 740,

---

[2]  Notwithstanding Article 4A's clear language regarding the limit of its scope, Wells Fargo argues that Article 4A extends to Wells Fargo's payment of the funds at the time of the withdrawal.  Wells Fargo's argument in this regard is misplaced and conflicts with the above definitions.  Article 4A's definition of "payment" does not include the act of withdrawal.  Under Article 4A, a "payment" occurs when: "(1) the beneficiary is notified of the right to withdraw the credit; (2) the bank lawfully applies the credit to a debt of the beneficiary; or (3) funds with respect to the order are otherwise made available to the beneficiary by the bank."  13 Pa. Cons. Stat. § 4A405(a).  This Court finds that this definition, consistent with the above described scope of Article 4A, does not extend to the point at which a beneficiary ***actually*** withdraws money from an account.

[3]  In his response, Plaintiff suggests that this Court should defer a substantive ruling on the present motion until the evidentiary record is more fully developed in order to determine whether his claims could be better supported under the state law of some jurisdiction other than Pennsylvania.  "The Third Circuit has instructed that before a district court applies the applicable choice-of-law analysis it must first determine whether a conflict of law actually exists pursuant to a three-step inquiry."  *Riffin v. Conrail Corp.*, 363 F. Supp. 3d 569, 574 n. 4 (E.D. Pa.), *aff'd*, 783 F. App'x 246 (3d Cir. 2019) (citing *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007).  "This inquiry includes, first, a determination whether an actual or real conflict exists between the laws of the jurisdiction at issue."  *Id.*  Only if there is an actual conflict must the court proceed to the second and third inquiries.  *Id.*

Here, Plaintiff has not identified any state law that might arguably apply to his claims and that presents an "actual or real conflict" with the Pennsylvania law under which he argues his claims.  In the absence of an actual or real conflict, and because both parties have focused their legal arguments exclusively on Pennsylvania law, this Court will apply Pennsylvania law.

746 (Pa. 2005). "In negligence cases, a duty consists of one party's obligation to conform to a particular standard of care for the protection of another. This concept is rooted in public policy." *Id.* "Negligence is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances." *Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214, 221 (Pa. 2018) (quoting *Martin v. Evans*, 711 A.2d 458, 462 (Pa. 1998)).

As discussed, Plaintiff, a noncustomer of Wells Fargo, contends that Wells Fargo owed him a duty of care : (1) when opening the Account and (2) when allowing the withdrawal of the transferred funds immediately from the Account. In support, Plaintiff makes two arguments as to the source of Wells Fargo's duty. First, Plaintiff argues that the alleged duties of care arise under the Restatement of Torts (1934) and Restatement (Second) of Torts (1965), which have been adopted by the Pennsylvania Supreme Court. Alternatively, Plaintiff argues that this Court should apply the test established by the Pennsylvania Supreme Court in *Althaus v. Cohen*, 756 A.2d 1166 (Pa. 2000) and impose previously-unrecognized duties. However, "if a common law duty exists under the Restatement (Second) of Torts, the *Althaus* analysis is not necessary." *Scampone v. Grane Healthcare Co.*, 169 A.3d 600, 617 (Pa. Super. Ct. 2017). This Court will first address whether Plaintiff has pled facts sufficient to trigger a duty of care under Pennsylvania common law in accordance with the applicable Restatement.

Initially, this Court notes that the Pennsylvania Supreme Court has not previously decided the issue of whether a bank, such as Wells Fargo, owes a duty to a noncustomer, such as Plaintiff. Thus, this Court

> must predict how the state's highest court would resolve the issue. *Borman v. Raymark Indus., Inc.*, 960 F.2d 327, 331 (3d Cir. 1992). Although not dispositive, decisions of state intermediate appellate courts should be accorded significant weight in the absence of an indication that the highest state court would rule

otherwise.   *See Rolick v. Collins Pine Co.*, 925 F.2d 661, 664 (3d Cir. 1991), *cert. denied*, 507 U.S. 973 (1993).

*Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1373 n.15 (3d Cir. 1996).  As such, this Court will look to decisions of Pennsylvania's intermediate appellate courts, as well as those of the Pennsylvania Supreme Court, to predict how the Pennsylvania Supreme Court would resolve the issue before this Court.

### *Common Law Duty Under the Restatement*

Plaintiff argues that Wells Fargo had a common law duty to avoid creating an unreasonable risk of harm to Plaintiff (a noncustomer) under two Pennsylvania precedents applying the Restatements; *to wit*: *Dittman v. UPMC*, 196 A.3d 1036 (Pa. 2018) and *Anderson v. Bushong Pontiac Co.*, 171 A.2d 771 (Pa. 1961).  Notably, neither one of these two cases involved a bank or, more specifically, a bank's purported duties to noncustomers.  Nor has Plaintiff cited to a single case in this or any other jurisdiction that has found that a bank owes any duties to noncustomers.  To the contrary, decisions across the country, including within Pennsylvania, have held that banks do not owe any duty of care  to noncustomers and/or third parties.[4]

Notwithstanding, Plaintiff offers *Dittman* for the general proposition that "in scenarios involving an actor's affirmative conduct, he is generally under a 'duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act.'"  196 A.3d at 1046 (quoting *Seebold v. Prison Health Servs.*, 57 A.3d 1232, 1246 (Pa. 2012)); *see also* Restatement (Second) of Torts (1965) § 302 cmt. a.  Plaintiff argues that *Dittman*'s

---

[4]      *See, e.g.*, *Adkins v. Sogliuzzo*, 625 F. App'x. 565, 569 (3d Cir. 2015); *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 431 F. App'x. 17, 20 (2d Cir. 2011); *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 225 (4th Cir. 2002); *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 519 (5th Cir. 2018); *SFS Check, LLC v. First Bank of Del.*, 774 F.3d 351, 357-58 (6th Cir. 2014); *see also Commerce Bank v. First Union Nat'l Bank*, 911 A.2d 133, 139 (Pa. Super. Ct. 2006) (holding a bank does not have a duty to take action against a client's bank account when the bank suspects fraud, in order to protect a third-party bank from future similar fraudulent conduct).

application of this general rule is applicable here because Wells Fargo is comparable to the defendant in *Dittman* who failed to properly collect and store its employees' personal information, which resulted in a third party committing a cyber-crime against the employees.  This Court disagrees, and finds *Dittman* distinguishable from the present case.

In *Dittman*, the Pennsylvania Supreme Court recognized the legal duty of an employer "to exercise reasonable care to safeguard its employee's sensitive personal information stored by the employer on an internet accessible computer system."  *Dittman*, 196 A.3d at 1038.  There, the employer required its employees to provide sensitive personal information, and then stored that information on its internet-accessible computer system without implementing adequate security measures to safeguard the employees' information.  *Id.* at 1038-39.  Because the employer's affirmative conduct (*i.e.*, requiring the employees to submit their information to the employer and then collecting and storing it) created the risk of a data breach, "[the employer] owed [its] [e]mployees a duty to exercise reasonable care to protect them against . . . harm arising out of that act."  *Id.* at 1047.  Plaintiff argues that Wells Fargo is similar to the defendant-employer in *Dittman* because Wells Fargo subjected Plaintiff to an "unreasonable risk of harm" when it "improperly opened a fraudulent account that facilitated a cyber-crime" and failed to "monitor the subsequent transactions for fraudulent activity." (Pltf. Br. at 13).  However, unlike in *Dittman*, which involved a relationship and the duties owed by an employer to its employees, here, there is no relationship (contractual or otherwise) between Wells Fargo and Plaintiff, a noncustomer.  In addition, Plaintiff does not allege that Wells Fargo engaged in any conduct similar to that of the *Dittman* employer; there are no allegations in the complaint that Wells Fargo required Plaintiff to submit any personal information, stored any of Plaintiff's information, or took *any* affirmative action toward Plaintiff that could be conceived as "creat[ing] a 'special relationship' with and an increased risk of harm

to [Plaintiff]." *Feleccia v. Lackawanna Coll.*, 215 A.3d 3, 15 (Pa. 2019).   These significant distinctions make *Dittman* inapposite here.

Plaintiff's reliance on *Anderson* is equally misplaced.   In *Anderson*, the court adopted and applied the Restatement of Torts § 302(b) (1934)[5] in finding that a car dealership owed a duty to a pedestrian who was injured by one of the dealership's vehicles that had been stolen by a fourteen-year-old boy.   171 A.2d at 772.   Plaintiff contends that *Anderson* is applicable here because, like the car dealership, Wells Fargo allegedly knew that third-party criminal conduct might result from the factual circumstances alleged.   That is, Plaintiff argues that Wells Fargo knew that criminal conduct regularly occurs through fraudulently-opened accounts, like the Account opened by Chea, and, on that basis, Wells Fargo owed a duty to noncustomers, like Plaintiff, and to other potential fraud victims.   This Court finds *Anderson* distinguishable and is unpersuaded by Plaintiff's argument.

The Restatement provision adopted and applied in *Anderson* provides: "A negligent act may be one which . . . creates a situation which involves an unreasonable risk to another because of the expectable action of the other, a third person, an animal or a force of nature."   171 A.2d at 773 (quoting Restatement of Torts § 302(b) (1934)).   Further, comment i to § 302(b), which was also applied in *Anderson*, provides: "If the actor knows or should know that the safety of the situation which he has created depends upon the actions of a particular person or a particular class of persons, he is required to take into account their peculiar characteristics of inattention,

---

[5]        In his response, Plaintiff incorrectly cites *Anderson* as relying on Restatement (Second) of Torts § 302B (1965).   In reality, *Anderson*, which was decided in 1961, relied on § 302(b) of the Restatement of Torts (1934).   171 A.2d 773.   Notably, § 302(b) in *Anderson* is the predecessor to § 302(b) of the Restatement (Second) of Torts, which is distinct from the § 302B that Plaintiff cites and seeks to have applied.   *Suchomajcz v. Hummel Chemical Co.*, 524 F.2d 19, 24 (3d Cir. 1975).   Section 302B is merely a special application of the Restatement (Second) of Torts § 302(b).   Restatement (Second) of Torts § 302B, cmt. a.   In the following analysis, this Court will apply the proper section—§ 302(b)—as it is both the section cited in *Anderson* and what  Plaintiff actually appears to argue in his brief.

carelessness, unskillfulness, or even recklessness or lawlessness if he knows or should know thereof." 171 A.2d at 773 (emphasis omitted). The United States Court of Appeals for the Third Circuit ("Third Circuit") has held that when plaintiffs rely on § 302(b) to impose a duty for the actions of a third party, "[t]he element of foreseeability has been the crucial determinant[.]" *Suchomajcz v. Hummel Chemical Co.*, 524 F.2d 19, 24 (3d Cir. 1975). Thus, for a plaintiff to successfully rely on § 302(b), "the act of the third party [must] be foreseeable." *Id.* at 24.

When applying this section of the Restatement to the facts therein, the *Anderson* court found that the act of the third party was foreseeable, and that the car dealership owed a duty to the noncustomer plaintiff, because of the fact that the dealership was actually on notice that one of its cars might be stolen and driven off of the lot by an incompetent driver, *i.e.*, a fourteen-year-old boy. *Anderson*, 171 A.2d at 775. In *Anderson*, the car dealership was aware that teenagers had frequently trespassed in the car lot around the time of the incident. *Id.* at 772. In addition, just two days before the incident in *Anderson*, the dealership discovered that the keys to one of the cars on the lot had been stolen by one of the fourteen-year-old boys that had frequented the lot. *Id.* Notwithstanding this known theft of the car keys by a fourteen-year-old boy, the dealership left the car unattended on the lot and took no precautions to prevent its operation. *Id.* Two days after the theft of the keys, another fourteen-year-old boy used the stolen keys to steal the car itself and drove it "in such a grossly negligent manner that it mounted a public sidewalk, [and] struck the plaintiff, a pedestrian." *Id.* Based on the foregoing, the *Anderson* court found that the plaintiff had sufficiently pled that the defendant owed him a duty because the acts of the third-party teenager were foreseeable, since the facts "clearly put the defendant in that case on notice, not only that the automobile was **likely** to be stolen, but also that it was **likely** to be stolen and operated **by an**

*incompetent driver*." *Liney v. Chestnut Motors, Inc.*, 218 A.2d 336, 337 (Pa. 1966) (summarizing *Anderson*'s findings) (emphasis added).[6]

Here, unlike in *Anderson*, Plaintiff has not alleged anywhere near the degree of specific facts necessary to show that Wells Fargo was on notice of the likelihood that the Account was part of a fraudulent scheme to which a noncustomer like Plaintiff would fall victim. At most, Plaintiff has alleged that banks like Wells Fargo were generally on notice that such schemes exist. However, Plaintiff does not allege ***any*** facts to suggest that when Wells Fargo actually opened the Account, it should have been on notice that this particular account was being opened for criminal or fraudulent purposes.

With respect to the withdrawal of the funds, Plaintiff alleges that Wells Fargo should have suspected fraudulent activity simply because the funds were "immediately withdrawn" from a recently opened account. These facts, however, are insufficient to place Wells Fargo on notice that it was "likely" that the withdrawals were part of some fraudulent scheme. Thus, unlike in *Anderson*, Plaintiff's complaint is devoid of factual allegations necessary to place Wells Fargo on notice that third-party criminal conduct was likely to result. Thus, *Anderson* and § 302(b) do not support imposing the requested duties on Wells Fargo in this case.

In sum, Plaintiff has not pled facts sufficient to show that Wells Fargo owed a duty of care to Plaintiff under the Restatement, *Dittman*, or *Anderson*,. This conclusion is consistent with the prevailing general rule that banks do not owe a duty of care to noncustomers. *See Adkins v. Sogliuzzo*, 625 F. App'x. 565, 569 (3d Cir. 2015) (quoting *City Check Cashing, Inc. v. Mfrs.*

---

[6]     Notably, the *Liney* court, in applying *Anderson* to the very similar facts before it, declined to find a duty because while the *Liney* defendant's auto shop was located in an area that had recently experienced many car thefts, the injured pedestrian-plaintiff in *Liney* did not allege that the defendant was on notice that the car thief would likely be an incompetent driver. *Id.* The *Liney* court's analysis of *Anderson* is instructive here.

*Hanover Trust Co.*, 764 A.2d 411, 417 (N.J. 2001)) ("courts will typically bar claims of non-customers against banks"); *Eisenberg v. Wachovia Bank N.A.*, 301 F.3d 220, 225 (4th Cir. 2002) ("Courts in numerous jurisdictions have held that a bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship.") (collecting cases).

### *Common Law Duty Under the Althaus Factors*

Alternatively, Plaintiff argues for the creation of a newly-recognized duty under the *Althaus* factors.  In *Althaus*, the Pennsylvania Supreme Court established a five-factor policy test for courts to apply when considering whether a particular set of facts warrants imposing a duty where such a duty was not previously recognized.  *Feleccia*, 215 A.3d at 13 (citing *Althaus,* 756 A.2d at 1169); *Walters*, 187 A.3d at 222 (citing *Althaus,* 756 A.2d at 1169).  These factors are: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution."  *Althaus,* 756 A.2d at 1169.  No single factor, however, is dispositive.  *Phillips*, 841 A.2d at 1008.  Rather, courts must "assign[] appropriate weight to each policy factor, depending on the particularized nature of the asserted duty at hand and context."  *Seebold*, 57 A.3d at 1249.

### *1.     Relationship Between the Parties*

The first *Althaus* factor requires an examination of the relationship between the parties. *Walters*, 187 A.3d at 232.  "Duty is predicated on the relationship that exists between the parties at the relevant time."  *R.W.*, 888 A.2d at 747.  As the Supreme Court of Pennsylvania has recognized, "[t]ypically, whether the defendant owes a duty to the plaintiff arises from the relationship between *those* parties . . . ."  *Walters*, 187 A.3d at 232 (emphasis in original).   Thus, Pennsylvania courts follow the long-established general rule that:

> Although each person may be said to have a relationship with the
> world at large that creates a duty to act where *his own* conduct
> places others in peril, Anglo–American common law has for
> centuries accepted the fundamental premise that mere knowledge of
> a dangerous situation, even by one who has the ability to intervene,
> is not sufficient to create a duty to act.

*Id*. (quoting *Wenrick v. Schloemann–Siemag Aktiengesellschaft*, 564 A.2d 1244, 1248 (Pa. 1989)

(emphasis in original)); *see also Feld v. Merriam*, 485 A.2d 742, 746 (Pa. 1984) ("[T]here is a

general rule against holding a person liable for the criminal conduct of another absent a preexisting

duty.").  Further, "[t]he fact that the actor realizes that action on his part is necessary for another's

aid or protection does not of itself impose upon him a duty to take such action[.]"  *Walters*, 187

A.3d at 233 (quoting Restatement (Second) of Torts § 314 when assessing the first *Althaus* factor).

This is true "irrespective of the gravity of the danger to which the other is subjected and the

insignificance of the trouble, effort, or expense of giving him aid or protection."  *Id.*  Further, the

absence of a relationship between the parties amounts to "a ***significant*** factor that weights against

the existence of a duty."  *Citizens Bank of Pennsylvania v. Reimbursement Technologies, Inc.*, 609

F. App'x 88, 92 (3d Cir. 2015) (emphasis added); *see also Menkes v. 3M Co.*, 2018 WL 2298620,

*11 (E.D. Pa. May 21, 2018) ("where courts have found no discernable relationship between

plaintiff and defendant, this factor weighs against the existence of a duty.") (citing *Berrier v.

Simplicity Mfg., Inc.*, 563 F.3d 38, 40, 62 (3d Cir. 2009); *Phillips*, 841 A.2d at 1009)).

      Here, Plaintiff concedes, as he must, that the parties "did not have any type of identifiable

relationship at the time the fraud occurred."  (Pltf. Br. at 15).  Because the parties "were essentially

strangers to each other at the relevant time, this factor does not support a finding of a duty."

*Commerce Bank v. First Union Nat'l Bank*, 911 A.2d 133, 139 (Pa. Super. Ct. 2006).  Accordingly,

this Court finds that this factor weighs heavily against the existence of a duty.

### 2.     The Social Utility of the Actor's Conduct

"The second factor requires an examination of the social utility of the [d]efendant's conduct." *Menkes*, 2018 WL 2298620, at *11-12.  In the context of this factor, courts generally examine whether imposing a duty would confer a benefit upon society.  *See, e.g., Phillips*, 841 A.2d at 1009 (finding social utility in requiring a lighter manufacturer to implement a child restraint feature on lighters to prevent small children from creating a flame).  Here, there is obvious social utility in banks taking action to prevent fraudulent banking activity.  Taking "[s]uch action could discourage [criminals] from continuing this conduct, and thereby help to protect third parties and minimize losses."  *Commerce Bank*, 911 A.2d at 139.  Thus, this factor weighs in favor of a duty.  Nonetheless, as in *Citizen's Bank*, 911 A.2d at 92, neither party suggests that in the current context, this factor is particularly significant.

### 3.     Nature of the Risk and Foreseeability of the Harm

The third factor requires the Court to consider both the nature of the risk and the foreseeability of the harm.  *Phillips*, 841 A.2d at 1010.  The Pennsylvania Supreme Court has described this factor as "the most elusive . . . both in its definition and in determining the weight it should be afforded."  *Walters*, 187 A.3d at 236. "Regarding the third factor, duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others." *R.W.*, 888 A.2d at 747.  "Generally, [Pennsylvania] Courts have been reluctant to impose a duty to protect a member of the general public from the harmful acts of third parties, in the absence of special circumstances."  *Commerce Bank*, 911 A.2d at 139 (citing *Estate of Witthoeft v. Kiskaddon*, 733 A.2d 623 (Pa. 1999)) (other citations omitted).

As to the nature of the risk here, Plaintiff alleged in his complaint that "between October 2013 and May 2018 there were over 70,000 domestic and international [incidents of this very type

of fraud] resulting in losses in excess of $12.5 [billion dollars]."  (Compl. at ¶ 16(c)).  While this statistic certainly suggests that the risk of harm is significant in terms of dollars lost, it does not compare to other non-monetary risks such as loss of human life or physical harm.  *See Walters*, 187 A.3d at 236 (finding nature of risk significant where it amounted to a public health risk).[7] Moreover, Plaintiff does not provide sufficient factual context to assess the degree of financial risk when measured against the number of similar financial transactions that are not part of fraudulent schemes.  In the absence of this information, any assessment by this Court of the nature of the risk would be speculative.

Turning to the foreseeability component of this factor, the Pennsylvania Supreme Court in *Walters* held that this component required "foreseeable harm *to a foreseeable class of plaintiffs*" or "harm [that] is foreseeable *to the class to which the complaining party belongs*."  *Walters*, 187 A.3d at 236 (quoting *Cantwell v. Allegheny Cty*., 483 A.2d 1350, 1354 (Pa. 1984); *Commonwealth Dep't of Hwys. v. Eldridge*, 184 A.2d 488, 491-92 (Pa. 1962)) (emphasis in original).[8]  With the benefit of hindsight, an argument can be made that it was foreseeable that a noncustomer who was deceived into transferring money to an account at Wells Fargo might be the victim of a fraudulent scheme perpetrated by someone who opened the account for fraudulent purposes.  This, however, is not the test under Pennsylvania law, as the Court must determine "whether the harm to [plaintiff] was foreseeable ***in the first instance***."  *Commerce Bank*, 911 A.2d at 139 (emphasis added).  It is not enough for Plaintiff to merely allege that Wells Fargo knew at the time that nefarious

---

[7]      In a disability discrimination case (not applying *Althaus*), the Third Circuit noted that "the nature of risk" often depends on the significance or degree of potential harm.  *Donahue v. Conrail*, 224 F.3d 226, 231 (3d Cir. 2000) (quoting *Onishea v. Hopper*, 171 F.3d 1289, 1297 (11th Cir. 1999)).

[8]      In *Walters* the Pennsylvania Supreme Court expressed disagreement with the Superior Court's "broad definition" of foreseeability, finding it "at odds with the definitions [they] have employed in [] third-party duty cases . . . ."  187 A.3d at 236.

individuals regularly open accounts to perpetuate fraudulent schemes, even schemes such as the type alleged here.  The nature of the risk and foreseeability of the resultant harm as alleged by Plaintiff here are simply too "vague and attenuated" to show that "the harm to [plaintiff] was foreseeable in the first instance." *Id.* at 139.

Moreover, even if Plaintiff was deemed a foreseeable third-party victim, foreseeability "is not alone determinative of the duty question" and "is not necessarily a dominant factor" in the duty assessment.  *Seebold*, 57 A.3d at 1249 n.26 (holding court must assign appropriate weight to each *Althaus* factor depending on the nature and context of the duty in question).  For example, in *Estate of Witthoeft,* the Pennsylvania Supreme Court prioritized factors other than foreseeability in noting that a motorist injured by a physician's patient with bad vision was "simply not a foreseeable victim that this court will recognize." 733 A.2d at 630.   In doing so, the court refused to "stretch foreseeability beyond the point of recognition for to do so will be to make liability endless." *Id.*  Guided by these Pennsylvania appellate court decisions, this Court finds that this factor weighs against imposing a duty.

### 4.    Consequences of Imposing a Duty Upon the Actor

When evaluating the consequences of imposing a duty, the fourth factor requires courts to evaluate the "burden of imposing a duty upon [the defendant]."  *Walters*, 187 A.3d at 239. Under this factor, courts also assess whether the defendant is in the best position to prevent the harm. *See, e.g.*, *Sharpe v. St. Luke's Hosp.*, 821 A.2d 1215, 1220-21 (Pa. 2003); *Citizens Bank*, 609 F. App'x at 93 (concluding the fourth factor did not support a duty where the consequence of imposing a duty upon defendant, as opposed to plaintiff, would "effectively excuse [the plaintiff's] own failure" to protect itself from the harm when it stood in position to do so).

Here, Plaintiff seeks to impose on Wells Fargo the duty to verify the identity of each person opening an account and to take unspecified measures before allowing withdrawals of recently transferred sums of money from newly-opened accounts. Plaintiff argues that these duties are not heavy, burdensome, or intrusive, particularly because various state and federal regulations already require banks to verify the identity of persons opening accounts and withdrawing money. This Court certainly agrees with Plaintiff that the burden of requiring Wells Fargo to do something that it is already obligated to do under existing law is minimal, as is the burden to verify the identity of persons opening and withdrawing money from an account. However, as the Pennsylvania Supreme Court recognized in *Walters*, the fact that minimal effort by Wells Fargo might provide noncustomers like Plaintiff with "aid or protection" does not of itself warrant imposing a duty upon Wells Fargo to take such action. 187 A.3d at 233.

Further, the burden of imposing a duty on Wells Fargo to "pause and consider before permitting such withdrawal of future untraceable funds," (Compl. at ¶ 21), merely because a withdrawal is large and was preceded by a funds transfer to a new account is significant. Imposing such a duty "would inevitably force banks to . . . restrict the[ir] clients' accounts on the least degree of suspicion, thereby alienating their customers, in order to avoid unspecified liability." *Commerce Bank*, 911 A.2d at 139. Just as the Pennsylvania Superior Court decided in *Commerce Bank*, this Court "decline[s] to make banks the guarantors of their clients' trustworthiness." *Id*.

Additionally, based on the facts alleged, it is at least arguable that Plaintiff, rather than Wells Fargo, was in the best position to prevent the harm he allegedly suffered. Prior to the underlying incident, Plaintiff "was in communications with Equitable Title of Celebration, LLC . . . with whom [he] communicated as to the funds to be transferred by him as part of the 'closing' process." (Compl. at ¶ 5). A person in Plaintiff's position could have undertaken efforts to confirm

with his own title company that the transaction was set to close, that the e-mail he received was in fact from his title company or an authorized agent thereof, or that the title company maintained a bank account at Wells Fargo.  Plaintiff, however, does not allege any such actions on his part.  Nor does he allege any other efforts on his own part to confirm that the account to which he was directed to wire $166,054.96 belonged to Equitable Title.  Thus, Plaintiff was at least equally situated with Wells Fargo to prevent his harm.

The Pennsylvania Supreme Court has also expressed disfavor in imposing a duty that amounts to an undefined liability upon the defendant:

> Yes, one can reason in so many instances that an extension of liability is merely a small step flowing naturally and logically from the existing case law. Yet each seemingly small step, over time, leads to an ever proliferating number of small steps that add up to huge leaps in terms of extension of liability. At some point it must stop . . . .

*Estate of Witthoeft,* 733 A.2d at 630 (quoting *Emerich v. Philadelphia Center for Human Development, Inc.,* 720 A.2d 1032, 1045 (Pa. 1998)); *see also Toney v. Chester County Hosp.,* 36 A.3d 83, 91 (Pa. 2011) ("we must draw lines to prevent unlimited liability to an unlimited number of plaintiffs, notwithstanding the commission of negligent acts.").  Here, Plaintiff's requested imposition of duties on a bank to noncustomers would subject banks to unlimited liability to an unlimited number of noncustomers.  With the aforementioned precedents in mind, and under the facts alleged, this Court finds that the fourth factor does not support imposing a duty on Wells Fargo to a noncustomer.

### 5.  Overall Public Interest in the Proposed Solution

When analyzing the overall public interest, the Superior Court of Pennsylvania "has looked at other court's decisions in different jurisdictions as persuasive authority as to where the public interest lies."  *Gillen v. Boeing Co.*, 40 F. Supp. 3d 534, 541 (E.D. Pa. 2014) (citing *Commerce*

*Bank*, 911 A.2d at 140).  As noted above, courts throughout the country that have confronted the issue *sub judice* have declined to impose a duty on a bank with respect to a noncustomer.  *See supra* n. 4.  This Court finds the consistent, prevailing, nationwide caselaw persuasive as indicating that there is minimal public interest in imposing the requested duties on banks like Wells Fargo under these circumstances.

Notably, the Superior Court's decision in *Commerce Bank* is particularly persuasive with respect to this Court's consideration of the fifth *Althaus* factor.  Like the vast majority of decisions nationwide, the Superior Court in *Commerce Bank* held that a bank did not owe a duty to a third party (there, another bank with which it had no existing relationship) to flag one of its customer's accounts as suspicious.  911 A.2d at 140-41.  In assessing the public interest factor, the Superior Court noted "that the banking industry is well-regulated[,]" but that the regulation the plaintiff referenced did "not create a private right of action."  *Id*. at 140.   Finding that there did not appear to be a great public interest in the plaintiff's proposed solution, the Superior Court stated that it "was reluctant to impose liability where federal and state banking laws do not."  *Id.*

Like the Superior Court in *Commerce Bank*, this Court finds that the prevailing general rule that banks do not owe a duty to noncustomers is persuasive and supports the conclusion that there is no public interest in imposing a duty on banks, like Wells Fargo, to protect noncustomers from fraudulent schemes like the one alleged here.  In addition, and like the Superior Court found in *Commerce Bank*, this Court finds that the omission of a private right of action under state or federal banking laws and/or regulations is instructive in determining where the public interest lies.  Like the *Commerce Bank* court, this Court is reluctant to impose liability where the state and federal banking laws do not.  *Commerce Bank*, 911 A.2d at 140.  For these reasons, this Court concludes that this factor weighs against imposing the proposed duties.

### *Weighing the Factors*

"Courts should not enter into the creation of new common law duties lightly." *Feleccia*, 215 A.3d at 13. Of vital note, when determining whether to impose a previously-unrecognized duty through the *Althaus* factors, the Pennsylvania Supreme Court reiterated that it has "adopted the default position that, unless the justifications for and consequences of judicial policymaking are reasonably clear with the balance of [the *Althaus*] factors ***favorably predominating***, [it] will not impose new affirmative duties." *Id.* (quoting *Seebold,* 57 A.3d at 1245) (emphasis added). Here, this Court has found that only the second factor weighs in favor of imposing the duties sought by Plaintiff, while the remaining four factors weigh heavily in favor of not establishing such duties. As such, it cannot be said that the balance of factors "favorably predominate" in favor of imposing the requested duties.

As noted at the outset, because the issue before this Court has not yet been decided by the Pennsylvania Supreme Court, this Court must look to decisions of Pennsylvania's intermediate appellate courts to predict whether the Pennsylvania Supreme Court would impose a duty on a bank to a noncustomer under the circumstances alleged. In light of the Pennsylvania caselaw discussed above, as well as the prevailing nationwide rule rejecting the imposition of such duties to noncustomers, this Court predicts that the Pennsylvania Supreme Court would not impose such a duty here.

**CONCLUSION**

For the reasons stated herein, this Court concludes that Plaintiff has failed to allege facts sufficient to invoke or trigger the duties he seeks to impose on Wells Fargo. As such, Plaintiff has failed to state a claim for negligence. Therefore, Defendant's motion to dismiss is granted and the complaint is dismissed in its entirety. An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO,* U.S.D.C. J.